NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0577n.06

No. 25-3249

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JOSE ANTIONIO SILVA DEL AGUILA,     )
     )
     )
Petitioner,     )
     )
v.     )
     )
PAMELA BONDI, Attorney General,     )
Respondent.     )
     )

**FILED**
Dec 15, 2025
KELLY L. STEPHENS, Clerk

ON PETITION FOR REVIEW FROM THE UNITED STATES BOARD OF IMMIGRATION APPEALS

OPINION

Before: STRANCH, BUSH, and READLER, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Jose Antonio Silva del Aguila, a young Guatemalan man now living in the United States, applied for asylum, withholding of removal, and protection under the Convention Against Torture. The Immigration Judge denied all three claims. The Board of Immigration Appeals affirmed the Immigration Judge's determination that Silva del Aguila did not show a nexus between his particular social group and the harm he experienced and that Guatemalan officials acquiesced in that harm. Because substantial evidence supported these rulings, we **DENY** Silva del Aguila's petition for review.

### I. BACKGROUND

#### A. Factual Background

Silva del Aguila is a native and citizen of Guatemala who entered the United States as an unaccompanied minor on August 31, 2016. He grew up in Mixco, Guatemala, in a large family that was well-known in the community, but both his parents passed away before he turned fifteen.

When Silva del Aguila was fifteen, the MS-13 gang attacked him, beat him unconscious, and broke his leg; he went to the hospital for his injuries but did not report the attack to police. He believes the gang targeted him after his sister—who had been threatened by the gang a week earlier—refused to join. He went into hiding following this incident, remained in his home for a year, then lived with a different sister in another city for two months. When Silva del Aguila returned to Mixco, a gang member attempted to recruit him. When he refused to join, six gang members hit and beat him, leaving him unconscious with a broken nose and permanent scars. He went to the hospital for his injuries but did not report the attack to police. Silva del Aguila then fled to the United States, entering around San Luis, Arizona. He was apprehended, given a credible fear interview, and released.

### B. Procedural Background

On September 18, 2017, the Government initiated removal proceedings against Silva del Aguila and issued a Notice to Appear (NTA). He admitted the NTA's factual allegations and conceded that he was subject to removal, but as a form of relief, he sought political asylum under 8 U.S.C. § 1158(b)(1)(A), withholding of removal under 8 U.S.C. § 1231(b)(3), and protection under the Convention Against Torture (CAT). Silva del Aguila sought asylum and withholding of removal based on membership in two particular social groups, which he defined as "Guatemalan males between the ages of 18 and 25 without parental protection" and "immediate family members of [the] Silva Del Aguila family in Mixco [], Guatemala." AR 198.

On June 13, 2019, Silva del Aguila appeared before the Immigration Judge (IJ) and filed an application for relief. A hearing before the IJ was held on December 1, 2021, during which he testified. The IJ determined that Silva del Aguila was credible, but she denied his application for asylum, withholding of removal, and CAT protection. The IJ denied the asylum and withholding

of removal claims, in part, because Silva del Aguila had failed to establish a nexus between his proposed social groups and the harm he suffered. The IJ rejected the CAT claim because Silva del Aguila did not show that it was more likely than not that the gang would continue to harm him upon his return and that the Guatemalan government acquiesced in his torture.

On December 23, 2021, Silva del Aguila appealed the IJ's decision to the Board of Immigration Appeals (BIA). The BIA affirmed the IJ's decision.

Silva del Aguila timely appealed.

## II. DISCUSSION

Silva del Aguila contends that the BIA erred in affirming the IJ's denial of his claims because he sufficiently established a nexus between his protected social groups and the harm he suffered and because substantial evidence showed that Guatemalan authorities acquiesced in his torture. We address each argument in turn below.

### A. Standard of Review

We review the BIA's decision as the final agency determination when the BIA has reviewed the IJ's decision and issued a separate opinion. *Zometa-Orellana v. Garland*, 19 F.4th 970, 976 (6th Cir. 2021). And we also review the IJ's decision to the extent the BIA adopted its reasoning. *Id.* We review legal conclusions de novo, and factual findings under the substantial-evidence standard. *Turcios-Flores v. Garland*, 67 F.4th 347, 353–54 (6th Cir. 2023) (citing *Juan Antonio v. Barr*, 959 F.3d 778, 788 (6th Cir. 2020)). Under this standard, factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Zometa-Orellana*, 19 F.4th at 976 (citation modified).

**B.** **Asylum Claims**

To be eligible for asylum, a petitioner must show that he is "unable or unwilling" to return to his country of origin because he was persecuted, or has a well-found fear of persecution, based on his race, religion, nationality, political opinion, or membership in a particular social group. 8 U.S.C. § 1158(b)(1)(A) (adopting eligibility requirements from 8 U.S.C. § 1101(a)(42)(A)). To demonstrate membership in a cognizable particular social group, petitioner must show that "the group is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Turcios-Flores*, 67 F.4th at 354 (citation modified). Where a particular social group is cognizable, a petitioner must also show a nexus between his persecution and that particular social group. *Id.* at 357. In other words, he must demonstrate that his membership in that group was "one central reason" for his persecution. 8 U.S.C. § 1158(b)(1)(B)(i). A nexus determination is a finding of fact that we review under the substantial-evidence standard. *Turcios-Flores*, 67 F.4th at 357.

Silva del Aguila asserts that the BIA erred in affirming the IJ's ruling that he did not establish a nexus between his membership in a protected group and the harm he suffered. The IJ determined that the nexus was "non-existent" because "the gang was seeking to increase their power and ranks in the community" and was not targeting Silva del Aguila based on a protected ground. R. 5, Administrative Record, 157. The BIA affirmed the IJ's decision, concluding that Silva del Aguila's claim failed on nexus grounds. It noted that the gang's recruitment of Silva del Aguila's sister contradicted his proposed social group of young "Guatemalan males" and its recruitment of only four of his twelve siblings contradicted his proposed group of "immediate family members." AR 5.

At the hearing, Silva del Aguila testified that the MS-13 gang attempted to recruit him as well as four of his twelve siblings, including his sister. He also testified that MS-13 recruited individuals outside his family as the gang was attempting to enlist a lot of people during this time. On this record, there was substantial evidence from which the IJ could conclude that MS-13 did not target Silva del Aguila because he was a young Guatemalan male—as the gang also recruited his sister—or because he was part of the Silva del Aguila family—as the gang also recruited individuals outside his family. When the IJ directly asked Silva del Aguila why he thought the gangs were targeting him, he responded that "the gangs . . . are an organization that they want you to join . . . whether you . . . want to or not." AR 246. When asked if there was "any other reason" for the harm, he responded "no." *Id.* Through this exchange, the IJ gave Silva del Aguila the opportunity to connect his membership in a protected group to the harm he suffered, but instead, he responded that the gangs targeted him solely for recruitment purposes. On a similar record, we have held that such testimony is insufficient to establish a nexus. *Sabastian-Andres v. Garland*, 96 F.4th 923, 930 (6th Cir. 2024).

Silva del Aguila asserts that the IJ and BIA "misapplied the nexus requirement." Petitioner's Br. 28. He first defined his social groups as "Guatemalan males between the ages of 18 and 25 without parental protection" and "immediate family members of the Silva-Del Aguila family in Mixco, Guatemala." *Id.* at 23. This definition is consistent with how Silva del Aguila defined his groups before the IJ. In his appeal to the BIA, he sought to change the first proposed social group to "Guatemalan males between the ages of 15 and 25"—because he was fifteen when the gang targeted him. *Id.* The BIA rejected his request to amend the social group, and Silva del Aguila now argues for a new definition of his social groups before this court. He now defines them as "family members of individuals who have resisted gang recruitment" and "individuals

who have refused to join gangs in El Salvador."[1]  *Id.* at 29.  Based on these new definitions, Silva del Aguila argues that a nexus exists because "refusal to join a gang is a protected characteristic." *Id.* at 31.  But such a definition is inconsistent with how he previously defined his social groups, and we decline to consider a social group presented for the first time at this stage in the proceedings.  *See Gonzalez-Valencia v. Barr*, 764 F. App'x 510, 512–13 (6th Cir. 2019).  Silva del Aguila provides no other argument as to why the record compels a conclusion that the IJ erred in ruling that a nexus does not exist.[2]

Accordingly, we affirm the denial of Silva del Aguila's asylum claim.

### C.    Claims for Withholding of Removal

To qualify for withholding of removal, a petitioner must show that if removed to his country of origin, his "life or freedom would be threatened" based on his "race, religion, nationality, membership in a particular social group, or political opinion."   8 U.S.C. § 1231(b)(3)(A).  As in an asylum claim, the petitioner must establish a nexus between an enumerated protected ground and the alleged harm.  *Turcios-Flores*, 67 F.4th at 358.  A withholding of removal claim, however, only requires a petitioner to show that the protected ground was "a reason"—instead of the central reason—for the alleged persecution.  *Mazariegos-Rodas v. Garland*, 122 F.4th 655, 677 (6th Cir. 2024) (quoting *Guzman-Vazquez*, 959 F.3d at 272).

---

[1] Silva del Aguila is from Guatemala, so this new group definition of "individuals who have refused to join gangs in El Salvador" appears to be a mistake.

[2] Silva del Aguila also contends that because the BIA did not expressly adopt the IJ's ruling on each issue, it conceded that Silva del Aguila was correct on those issues. The BIA, however, stated that because it affirmed the IJ's decision that a nexus did not exist, it "need not address [Silva del Aguila's] additional arguments regarding his eligibility for asylum and withholding of removal." AR 5. We have previously held that the BIA is not required to decide issues unnecessary to the outcome of the case, and such a decision does not constitute concession of those issues. *Rahman v. Bondi*, 131 F.4th 399, 409 (6th Cir. 2025); *see also INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam). Silva del Aguila's argument fails.

Silva del Aguila contends that the BIA erred in affirming the IJ's decision that he did not qualify for withholding of removal because he failed to establish a nexus, despite the more lenient standard. The IJ ruled that the nexus was non-existent, explaining that Silva del Aguila failed to establish that one of his social groups was a reason for the harm he suffered. The IJ found that MS-13 targeted Silva del Aguila to coerce him into joining and not based on animus toward his family or for any other protected ground. The BIA affirmed the IJ's decision. As explained above, the record does not show a nexus between one of Silva del Aguila's social groups and the harm he suffered. *See supra* Part II.B. And where, as here, the record shows "no nexus at all," it does not compel the conclusion that the IJ erred in ruling that the nexus requirement was not satisfied, even under the more lenient standard. *Sabastian-Andres*, 96 F.4th at 931.

Accordingly, we affirm the denial of Silva del Aguila's withholding of removal claim.

**D.     Claims Under the Convention Against Torture**

To qualify for CAT protection, a petitioner must show that he would more likely than not be tortured if he returned to his country of removal. *Vasquez-Rivera v. Garland*, 96 F.4th 903, 911 (6th Cir. 2024). Such torture must be inflicted with a public official's consent or acquiescence. *Mateo-Esteban v. Garland*, 125 F.4th 762, 768 (6th Cir. 2025) (citing 8 C.F.R. § 1208.18(a)(1)). Officials acquiesce to the torture if they know of it before it occurs and then do not intervene despite a legal responsibility to do so. *Id.* (citing 8 C.F.R. § 1208.18(a)(7)). Acquiescence can include "willful blindness" to torture of a private individual. *Sabastian-Andres*, 96 F.4th at 931 (quoting *Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006)).

Silva del Aguila contends that the BIA erred in affirming the IJ's decision that he did not qualify for CAT protection. The IJ ruled that although the gang attacks constituted torture, Silva del Aguila failed to establish that Guatemalan authorities turned a blind eye to such torture because

he never filed a police report and never informed authorities of the attacks. The IJ also ruled that Silva del Aguila had not established that the gang is more likely than not to torture him upon his return as his siblings continue to live in Guatemala and have not been attacked. The BIA affirmed on both grounds.

The record here shows that Silva del Aguila did not file a police report or otherwise inform authorities of the gang attacks. Such a failure indicates that the authorities never had the opportunity to acquiesce in the violence because they were unaware of it. *Sabastian-Andres*, 96 F.4th at 932. But the failure to inform authorities is not dispositive. *Id.* Turning to other record evidence, Silva del Aguila testified that he did not report the gang attacks because he feared the police would inform the gang of his report as MS-13 has bought the police. The record also shows that the MS-13 gang threatened Silva del Aguila's sister, Zoila, and extorted her business. She reported the incident to the police, but they did nothing.

Country condition reports introduced into the record corroborate Silva del Aguila's testimony. The reports indicated that impunity was widespread with "[c]orruption, concerted efforts by organized criminal actors, and lack of political will" impeding meaningful investigation and prosecution. AR 289. The reports explained that corruption was "particularly widespread in the police force, sectors of which are reported to use extortion or work with organized crime groups to facilitate the trafficking of drugs." AR 523 (footnote omitted). The reports further conclude that "documentation and reporting mechanisms for torture . . . remain[] weak." AR 291.

The record also indicates that the "police lack sufficient personnel and training to accomplish their mission." AR 454. And despite police efforts, in certain areas, they have "lost effective control to gangs and other organized criminal groups" and cannot protect inhabitants, including those threatened by gangs. AR 521. But the Guatemalan government has prosecuted

and imprisoned some gang members. The secondary sources, therefore, support different conclusions on whether Guatemalan officials were willfully blind to Silva del Aguila's harm. Although these sources show the Guatemalan government's inability to curb gang violence, they also show that it has taken some meaningful steps to address the problem, even if these efforts have not been very effective. *Sabastian-Andres*, 96 F.4th at 932 (explaining that "the authorities must be making *some* effort to respond to gang violence because gang members do go to prison in Guatemala" is evidence against willful blindness). When a country "has made meaningful efforts to control private violence but is still struggling to gain the upper hand," we generally do not consider public officials to be willfully blind to the problem. *Id.* at 931 (citing *Zaldana Menijar*, 812 F.3d at 502).

Two narratives therefore emerge from this evidence regarding whether Guatemalan officials acquiesced in Silva del Aguila's torture. On the one hand, the evidence suggests that the gangs control the police, that Guatemala does not have mechanisms for reporting or prosecuting torture, and that, as with Silva del Aguila's sister, police do not respond to reports of gang threats or extortion. On the other hand, the record also suggests that the government is attempting to curb gang violence, with at least some gang members going to prison, although such efforts appear to not yet have been very effective. At this stage in the case, "our task is not to pick the version that we believe is more convincing," but instead to determine whether there was "reasonable, substantial, and probative evidence" supporting the BIA's and IJ's decisions. *Sabastian-Andres*, 96 F.4th at 932. We determine there was.

Accordingly, we affirm the denial of Silva del Aguila's claim for CAT protection.

### E. Due Process Claims

Silva del Aguila argues that the IJ and BIA violated his Fifth Amendment due process rights. Such rights extend to noncitizens facing removal, *Bi Qing Zheng v. Lynch*, 819 F.3d 287, 296 (6th Cir. 2016) (quoting *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001)), and require that they receive "a full and fair hearing," *Sebastian-Sebastian v. Garland*, 87 F.4th 838, 853 (6th Cir. 2023) (citation modified). To determine whether there was a due process violation, we must ascertain whether there was a defect in the removal proceeding and whether it prejudiced the petitioner. *Bi Qing Zheng*, 819 F.3d at 296.

The BIA rejected Silva del Aguila's due process claim because he did not identify a procedural defect in the proceedings and instead raised substantive challenges to the IJ's factual and legal conclusions. Silva del Aguila asserts the same challenges before this court, arguing that the IJ and BIA violated his due process rights when they (1) narrowly construed his social groups, (2) misapplied the nexus requirement, (3) failed to properly consider evidence of country conditions, and (4) made factual findings unsupported by substantial evidence. Such challenges are disagreements with the IJ's and BIA's interpretation of the evidence and do not constitute a due process violation. *Sebastian-Sebastian*, 87 F.4th at 853.

Accordingly, we reject Silva del Aguila's due process claim.

### III. CONCLUSION

For the foregoing reasons, we **DENY** Silva del Aguila's petition.